HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

KEVIN GIEL,

    Plaintiff,

v.

RICHARD CANO, any any marital community thereof, and BANK OF AMERICA, and GENERAL MOTOR ACCEPTANCE CORPORATION (GMAC),

    Defendants.

Case No. C07-5270RBL

ORDER RE: SUMMARY JUDGMENT MOTIONS

THIS MATTER is before the Court on motions for summary judgment filed by Defendant Bank of America [Dkt. #26] and by Defendant GMAC [Dkt. #29]. The Court has reviewed the pleadings submitted by the parties for and against the motions and has participated in oral argument with counsel and is otherwise informed in the premises. For the reasons outlined below and at the time of oral argument, the Court **GRANTS** Bank of America's Motion [Dkt. #26] and **GRANTS IN PART** and **DENIES IN PART** GMAC's Motion [Dkt. #29].

## I. FACTUAL BACKGROUND

**A.**     **Factual Summary.**

Kevin Giel and Richard Cano both live in or around Vancouver, Washington. Cano has been a mortgage officer for various financial institutions in the Vancouver area for over 20 years. (Cano Dep. at

12-15.)[1] Giel has known Cano since 2001 or 2002. They first met while Cano was employed as a mortgage officer at First Horizon Mortgage, where Cano twice helped Giel refinance the mortgage on Giel's first home. (Cano Dep. at 23-29; Giel Dep. at 29-30.)

Giel and Cano maintained some contact over the ensuing years. In June 2006, at which time Cano was employed by GMAC, Giel and Cano began communicating about Giel's participation in a potential investment in Northrim Siding & Windows LLC, a company located in Alaska run by Bruce Trengove (a long-time acquaintance of Cano's). (Cano Dep. at 31-35; Giel Dep. at 48-51.) In late June 2006 or early July, Trengove traveled from Alaska to Vancouver, Washington to meet with Giel and Cano. (Cano Dep. at 36; Giel Dep. at 53-54.) At that meeting, Trengove gave Giel a large set of documents describing his company and the potential investment. (Cano Dep. at 36-39; Giel Dep. at 54-55.) Giel, Trengove, and Cano had several more discussions about the investment throughout June and July 2006, all while Cano was employed as a mortgage officer at GMAC. (Cano Dep. at 39-41; Giel Dep. at 51.)

Plaintiff alleges that unknown to him at the time of his investment, Mr. Trengove had left Washington years ago to escape creditors, tax liens, lawsuits and a bankruptcy. (Exhs. D, E, F, and G to Shaffer Dec.) The Clark County Superior Court reports more than <u>fifty</u> separate filings against Trengove. (Exh. G.) Trengove relocated to Alaska, where he again became the target of multiple lien foreclosures, lawsuits and judgments. (Exh. H.) Mr. Cano offered and discussed the Northrim investment with Giel both in person, and in dozens of phone calls. Cano assured Giel that Bruce Trengove had a business record of integrity, respect, and success. (Giel Dec. at ¶ 6; Giel Dep., pp. 51, 52, 102.) As noted above, this was false - - Trengove's records as a businessman would have been of concern to any potential investor. According to plaintiff, Cano assured Giel that he was not taking a fee for arranging the investment, but was doing it as a favor to his friend, Mr. Trengove. (Giel Dep. at 76-77; Giel Decl. at ¶ 10.) This was false. Cano also assured Giel that the proposed investment was financially promising, beneficial to Giel, and suitable for Giel's income needs. (Giel Dep. at p. 115, lines 6-12.)

---

[1] All references to the Cano Deposition are found at Exhibit A to the Declaration of William K. Rasmussen [Dkt. #27]. All references to the Giel Deposition are found at Exhibit B of the Rasmussen Declaration [Dkt. #27].

According to Giel, Cano's standing as a successful and experienced loan officer was an important factor in his reliance on Cano's advice. (Giel Dep. p. 100, lines 2-9.)

In late May or early June 2006, Cano was approached by Bank of America to see if he was willing to leave GMAC to go work as a mortgage officer at Bank of America. (Cano Dep. at 75-76.) Given the uncertain future of GMAC's Vancouver office, Cano decided to pursue the Bank of America opportunity. (Cano Dept. at 76-78; 144-146.) Cano had three interviews with Jim Christian (Cano's eventual manager at Bank of America), and one of those interviews also included Jim Christian's boss, Jeremy Walker. (Declaration of James Christian, ¶¶ 5-6.) As part of the hiring process, Bank of America performed a background check on Cano, which turned up nothing unsatisfactory. (Christian Dec., ¶ 7.) On July 10, 2006, Bank of America issued an offer to Cano to join Bank of America as a mortgage officer. Cano signed Bank of America's offer letter on July 15, 2006, but did not begin work at Bank of America until early August 2006. (Christian Dec., ¶¶ 8-9; Cano Dep. at 78-79.) Cano's last day at GMAC was August 2 or 3, 2006. (Cano Dep. at 18, 78-79.)

Kevin Giel was never a mortgage borrower or account holder at either GMAC or at Bank of America.[2] (Christian Dec. at ¶ 14; Giel Dep. at 108.) Approximately two months after first learning of the Alaska investment opportunity, Giel signed the agreement for his Alaska investment on August 4, 2006, at which time Cano had been a Bank of America employee for perhaps 1-3 days. (Giel Dep. at 59; Cano Dep. at 18.) Cano arranged to have the agreement notarized by a Bank of America employee, Eva Serrillos-Amaya. (Cano Dep. at 48-49; Giel Dep. at 61-62.) Giel says that notarization process took only 1-2 minutes and that he had no substantive discussion with Ms. Serrillos-Amaya about the Alaska investment deal. (Giel Dep. at 62-65.) According to the agreement he signed, Giel's total investment in Northrim Siding was supposed to be $500,000, with an initial payment of $100,000. From his account at Riverview Bank (he had no account at Bank of America), Giel wired $100,000 to Bruce Trengove in Alaska on August 8, 2006. (Giel Dep. at 74.) On August 15, 2006, Trengove wired $14,000 to Cano as a "finder's fee" for bringing Giel and Trengove together. (Cano Dep. at 58-60.) That money went solely into Cano's account; he did not give any portion of it to GMAC or Bank of America. (Cano Dep. at 60.)

---

[2] Giel has held a credit card with Bank of America for several years. (Christian Dec., ¶ 14; Giel Dep. at 35, 108.) In addition, in October 2006 (two months after he had sent his $100,000 to Trengove) Giel applied for a home equity loan from Bank of America, but that loan application was never followed through on by Giel. (Cano Dep. at 70; Giel Dep. at 92-95.)

ORDER
Page - 3

In the ensuing months, Giel received only $3,000 back from Trengove on the Alaska investment (Giel Dep. at 80.) When payments stopped coming, Giel (upon Cano's advice) refused to send Trengove any further money. (Cano Dep. at 71; Giel Dep. at 92, 95.) Neither Giel nor Cano have had any further communications with Trengove since late 2006 or early 2007. (Cano Dep. at 67-69; Giel Dep. at 90, 96.)

Plaintiff has alleged that the Northrim investment was at least the second private investment program that Cano had operated at GMAC. Defendant GMAC employed Richard Cano from November 2005 until August 3, 2006. The entire time he worked for GMAC, plaintiff claims Cano took money from GMAC customers for an investment he described as a "venture capital" enterprise. GMAC's records show at least ten investors in Cano's program, with total investments of more than $610,000.00. (Exh. C to Kauhi Dec.) Mr. Cano now claims that an overseas partner in the investment stole the investments and disappeared. (Cano Dep. at p. 113.)

It is not disputed that GMAC received a report or reports of Cano's activities while he was employed at GMAC. Two investors, Tim and Kristy Fire, sued Mr. Cano for fraud on June 5, 2006, while he was employed at GMAC. (Exh. J to Shaffer Dec.) Another investor, Jameson Kauhi, complained to GMAC in May 2006.

In response to Mr. Kauhi's complaint, the GMAC District Manager, Mark Schaller, contacted Mr. Cano and told him that a complaint had been received at GMAC, to the effect that Cano was "a scam artist" and a "thief." The District Manager for GMAC took no action in response to the fraud report, and did not ask any questions about it. Instead, the manager told Cano, "whatever legal issue it is or situation is, get it resolved as quickly as possible. That was it." (Cano Dep., p. 126; p. 128, lines 21-23.)

In a supplemental declaration, counsel for plaintiff identified a newly-produced email from Richard Cano to his District Manager at GMAC, Mark Schaller, stating that he disclosed the investment scheme to his District Manager "a couple of months" earlier in 2006. Cano states that he believed the investment scheme was also disclosed to "Ken," apparently a reference to Mr. Schaller's supervisor and GMAC Regional Manager, Ken Zener. Cano refers to a call from Mr. Schaller addressing a complaint made to GMAC by an unhappy securities investor:

> I appreciate you calling me last night and letting me know - - but as I told you last night - - I'm not interested in hearing what they have to say or are complaining about. **The purpose of my telling you a couple of months ago that this "Private Investment" deal was going down the drain fast,**

> was so that I can alert you that you may get some disgruntled investors because the deal went south. . . .
>
> **I just assumed you were going to talk to Ken and at least disclose it to him so he was aware. ...** I think Ken should know - - at least know that these people were involved with me on some "Private Deals." You guys can decide then whether I'm welcomed here as a Loan Officer or not. Otherwise release me from my employment agreement. . . .

(Exh. A to Supplemental Declaration, Dkt. #43.)

Mr. Schaller responded, "Come talk with me, you are overreacting." Exhibit A shows that GMAC was on notice in March, 2006 that Cano was engaged in investment solicitation and that the scheme may well have violated state and federal securities laws.

Plaintiff alleges that the email indicates that Mr. Schaller and GMAC knew of, and permitted, "outside" lending and investment advice by its loan officers. That inference contradicts GMAC's attempts to claim that it had no way of knowing that its lending officers were soliciting securities investments.

The email also indicated that Mr. Schaller took no action in response to the news that Cano was selling investments - - not in March, April, May, nor June of 2006.

Another email, one from Angela Cohagen, <u>a GMAC employee</u>, states that one of the customers in the investment fraud believed Mr. Cano was her "Financial Advisor." Plaintiff argues that the email supports an inference that Cano held himself out to customers of GMAC - - and to its employees - - as authorized to give investment advice and to solicit investments.

At all times, Cano was not licensed to sell investments. GMAC had a policy prohibiting its employees from engaging in outside business for their own benefit. As GMAC argues in its motion, its own rules provided for immediate termination of a loan officer caught selling unauthorized investments for his own personal profit. (Ken Zener Dep. at p. 31, lines 17-19.)

**B. Procedural History.**

In May 2007, Giel filed this lawsuit against Richard Cano and Bank of America. In January 2008, Giel amended his complaint to add GMAC Mortgage as an additional defendant. Plaintiff has asserted the following causes of action against Cano, Bank of America, and GMAC:

(1) Violation of the Securities Act of 1933.

(2) Violation of the Securities Act of 1934.

(3) Violation of the Washington State Securities Act.

ORDER
Page - 5

1     (4)     Violation of the Washington Consumer Protection Act.

2     (5)     Negligent Misrepresentation.

3     (6)     Breach of Fiduciary Duty.

4     (7)     Exploitation of Vulnerable Adult under RCW 74.34.200.

In addition, although not separately stated as a cause of action, plaintiff Giel also appears to be asserting claims against Bank of America and GMAC for negligent hiring, retention, and supervision of Richard Cano.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact which would preclude summary judgment as a matter of law. Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to present, by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In other words, "summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable [fact finder] could return a [decision] in its favor." *Triton Energy*, 68 F.3d at 1220.

## III. DISCUSSION

The plaintiff has expressly abandoned claims (6) and (7): breach of fiduciary duty and violation of the Vulnerable Adult Statute. Other claims, though not expressly abandoned, were not the focus of plaintiff's opposition to the defendants' motions. Rather, the plaintiff based his opposition on two claims. First, that the defendants were control persons for purposes of liability under federal and state securities laws and second, that the defendants were negligent in hiring, supervising and retaining Cano as an employee.

### A. Control Person Liability.

Section 15 of the 1933 Act provides for "control person" liability in certain circumstances:

> "Every person who, by or through stock ownership, agency, or otherwise . . . controls any person liable under . . . this title, shall also be liable jointly and severally with and to the same extent, as such controlled person . . . unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist."[3]

15 U.S.C. §77(o).

Control person liability under the 1934 Securities Act and Exchange Act is similar, though not identical under the provision in the 1933 Act. Under the Washington State Securities Act, liability can be imposed on a control person for violations of the Act "unless such person sustains the burden of proof that he or she did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." See RCW 21.20.430(3).

The evidence presented to the Court convinces it that no reasonable jury could reach any conclusion other than that the Bank of America had no knowledge of the Giel investment and no reason to believe Cano was involved in private investment promotion in violation of company policy. The Bank of America did not participate in the transaction and did not benefit from the transaction between Richard Cano, Kevin Giel and Bruge Trengove. At the time of the Giel investment, Cano had worked for Bank of America for only a few days. Although the Bank conducted its normal background check and interview process, it was never provided any information that put it on notice that Cano was a promoter of private investment opportunities for third parties.

As for GMAC, although Giel testified that he did not think that the Northrim investment had anything to do with GMAC, there is convincing evidence that GMAC knew of Cano's efforts to solicit third parties, including GMAC customers, into his private investment schemes. Like Bank of America, GMAC had a policy prohibiting Cano from engaging in any "activity, interest, investment or relationship" that would interfere with his ability to originate mortgage loans for GMAC, which included any "employment or gainful activity" outside of GMAC. (Cho Dec. at Exhs. F & G.) It seems clear from the evidence provided by plaintiff, that GMAC did not enforce its policy when it came to Mr. Cano. The

---

[3] For purposes of these motions, the Court assumes that Richard Cano was a direct seller of a security.

evidence suggests that GMAC superiors knew of Cano's outside activities, knew that he involved GMAC customers in his investment promotions, and knew that at least one investment program turned sour on the investors. The evidence also strongly suggests that these supervisors decided to tolerate Cano's extra-curricular activities even when Cano thought he had committed a firing offense. Under these circumstances, the Court cannot rule as a matter of law that GMAC is not a control person or that it falls within the good faith exception authorized by federal and state law.

### B. Negligent Hiring, Supervision, Retention.

For the reasons stated above, the Court is convinced that there is no genuine issue of material fact as to Bank of America's liability and it is entitled to judgment as a matter of law.

Similarly, for the reasons stated above, the evidence presented to the Court as to GMAC prevents it from granting GMAC's motion on this theory of the case.

### C. Violation of the Washington Consumer Protection Act.

The Court is convinced that there is no evidence of a direct misrepresentation or unfair or deceptive act or practice performed by GMAC in this case. Liability would therefore have to be imposed against GMAC under the doctrine of respondeat superior in determining whether an employee acted within the scope of his employment. In Washington, the test is "whether the employee was, at the time, engaged in the performance of the duties required of him by his contract of employment, or by specific direction of his employer; or . . . whether he was engaged at the time in the furtherance of the employer's interest." *Dickinson v. Edwards*, 105 Wn. 2d 457, 467 (1986).

The evidence submitted by the plaintiff creates a genuine issue as to whether GMAC knew of and acquiesced in, the solicitation of third parties, including GMAC customers, for private investment programs not formally endorsed by GMAC. The Court will not dismiss this claim on summary judgment.

### D. Negligent Misrepresentation.

For the reasons given in Section C above, the Court will not dismiss this claim against GMAC.

## IV. CONCLUSION

Bank of America's motion for summary [Dkt. #26] is **GRANTED** and all claims against Bank of America are **DISMISSED** with prejudice. GMAC's motion for summary judgment [Dkt. #29] is **GRANTED** as to plaintiff's abandoned claims - breach of fiduciary duty and exploitation of Vulnerable Adult and **DENIED** as to all other claims.

Dated this 29th day of October, 2008.

/s/ Ronald B. Leighton
RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE

ORDER
Page - 9